UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------x
                                                       :
MINERVA TEXIDOR                                        :              3:10 CV 701 (CSH)
                                                       :
V.                                                     :
                                                       :
MICHAEL J. ASTRUE,                                     :
COMMISSIONER OF SOCIAL SECURITY                        :              DATE: APRIL 11, 2011
                                                       :
------------------------------------------------------ x

## RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Supplemental Security Income ["SSI"] benefits.

## I.  ADMINISTRATIVE PROCEEDINGS

On December 10, 2007, plaintiff, Minerva Texidor, applied for SSI benefits claiming that she has been disabled since November 16, 2007 due to asthma, high blood pressure, a "heart problem," depression, difficulty dealing with others, and blindness in her left eye. (Certified Transcript of Administrative Proceedings, dated June 18, 2010 ["Tr."] 55-56, 95-101; see Tr. 116, 120).[1]  The Commissioner denied plaintiff's application initially, and upon reconsideration.  (Tr.  57-63, 68-77).  On September 3, 2008, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"](see Tr. 78-81, 85-87), and on October 29, 2009, a hearing was held before ALJ William J. Dolan, at which plaintiff and a vocational

_____

[1]There are a substantial number of duplicated pages in the record, and there are SSA records for another individual.  (See Tr. 110-15).

expert, Kerry Skillen, testified.  (See Tr. 38-54; see Tr. 88-91).[2]  Plaintiff was represented by

counsel.  (Tr. 38, 64-67, 92-94; see Tr. 82-84).  On November 4, 2009, ALJ Dolan issued his

decision in which he concluded that plaintiff is not disabled.  (Tr. 27-37).  On November 13,

2009, plaintiff, through her counsel, submitted a Decision Review Board Statement to the

SSA, along with additional medical records.  (Tr. 4-26).[3]  On March 11, 2010, the SSA issued

its Notice of Decision Review Board Action, informing plaintiff that the Decision Review Board

did not complete a timely review of plaintiff's claim, thereby rendering the ALJ's decision the

final decision of the Commissioner.  (Tr. 1-3).

On May 7, 2010, plaintiff filed her complaint in this pending action, and four days

later, this case was referred by Senior United States District Judge Charles S. Haight, Jr. to

this Magistrate Judge.  (Dkts. ##2, 5).[4]  On July 21, 2010, defendant filed his answer.  (Dkt.

#10).[5]  On October 16, 2010, plaintiff filed her Motion for Order to Reverse the Decision of

the Commissioner, or in the alternative, Motion for Remand, and brief and exhibits in support

---

[2]At the hearing before the ALJ, counsel for plaintiff noted at the outset that he had "no notice of a vocational expert" and was not provided with the vocational expert's curriculum vitae. (Tr. 41).  After agreeing to proceed with the hearing, counsel requested that he have an opportunity to "submit a posthearing statement if need be[ ]"; the ALJ responded, "That's fine." (Id.).  At the conclusion of the hearing, plaintiff's counsel stated, "I would just, again, ask to be able to submit a posthearing memorandum to address any additional questions with regard to the vocational [expert], just so that I could have a moment to review the physicians listed here. Aside from that, Your Honor, the record is complete."  (Tr. 54).  The ALJ responded, "All right.  If you're going to submit something, please get it in as quickly as possible." (Id.).  The hearing was held on October 20, 2009, and the ALJ issued his opinion eleven business days later, on November 4, 2009 (see Tr. 27), prior to plaintiff's counsel's submission of his post-hearing brief and copies of the additional medical records.  (See Tr. 4-26); see text accompanying note 3 infra and note 18 infra.

[3]See note 2 supra and note 18 infra.

[4]Plaintiff commenced this action with a Motion for Leave to Proceed In Forma Pauperis, which motion was granted on May 11, 2010.  (Dkts. ##1, 6).

[5]Attached to defendant's answer was a certified copy of the administrative transcript, dated June 18, 2010.

2

(Dkt. #15; see Dkts. ##12-13),[6] and on February 17, 2011, defendant filed his Motion to Affirm the Decision of the Commissioner and brief in support. (Dkt. #22; see Dkts. ##16-21).

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #15) is granted in part and denied in part, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #22) is granted in part and denied in part.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1962 and is forty-eight years old. (Tr. 95, 152). Plaintiff has two daughters and five grandchildren, she has never been married, and she lives alone in a third floor apartment.[7] (Tr. 42, 95-96, 119, 135, 163, 194-95, 276). Plaintiff completed the tenth grade, and while she was in school, she attended special education classes. (Tr. 42-44, 125, 195).

Plaintiff claims that her ability to work is limited by her asthma, high blood pressure, a "heart problem," depression, an inability to perform any heavy physical activity, and blindness in her left eye. (Tr. 120; see also Tr. 130). Additionally, plaintiff complains of problems with "constant" uterine bleeding, wheezing, fatigue, anemia, low self-esteem, and feelings of hopelessness and worthlessness. (Tr. 129; see Tr. 130). Plaintiff reported that as a result of two strokes, she is unable to see anything out of her left eye and she is "constantly dizzy," and her symptoms are worsened by her depression, stair climbing,

---

[6]Attached to plaintiff's brief in support is an Appendix of Doctors' Licensing and Board Certification records.

[7]Plaintiff described herself as "very independent" and she likes "being alone sometimes." (Tr. 140).

3

walking, performing daily chores and regular activities.  (Tr. 129, 132).

Plaintiff takes  Combivent, Albuterol, Singulair, and Proair for her asthma, Zolpidem as a sleep aide, Chantix for smoking sessation, Omeprozole, Bupropion to treat her depression, Hydrochlorothiazide to treat her high blood pressure, and Naproxen, Oxycodone, Ibuprofen,  and Nasonex.  (Tr. 130-31; <u>see also</u> Tr. 158, 165, 178, 182, 378).  Additionally, plaintiff has been prescribed Seroquel, Lexapro and Mirtazapine.  (Tr. 193).  According to plaintiff, most of her prescriptions make her "drowsy" so that she is not able to do normal activities.  (Tr. 132).  Additionally, plaintiff reported that she wakes up depressed and goes to bed depressed, "[due] to all the med[i]cations."  (Tr. 163).

Plaintiff cleans her home, does her laundry, and is able to bathe and prepare simple meals for herself, although she reported that she gets tired easily and sometimes her daughter comes by to take her out of the house, or calls her to remind her to take her medications.  (Tr. 135-36, 165-66; <u>see also</u> Tr. 44, 164).  Plaintiff testified at her hearing that it takes her two to three days to complete her household chores.  (Tr. 44).   According to plaintiff, she is "[t]oo tired to stand at the stove to cook for [herself,]" and because she cannot see well and is constantly fatigued, she is afraid she will burn herself.  (Tr. 137).  She does not have a license or a car but she takes the bus, and she goes out shopping with her daughter, to appointments, and to church, although she reported that "[s]ometimes [she is] afraid."  (Tr. 44-45, 46, 138, 140, 166, 168; <u>see</u> Tr. 47-48).  Plaintiff watches television, talks on the phone or listens to music "[a]s often as [she] can stay awake[,]" (Tr. 139; <u>see</u> Tr. 167-68), but she "can't 'party' anymore[ ] or work."  (Tr. 140).

According to plaintiff, her illnesses affect her ability to lift, squat, bend, stand, walk, talk, climb stairs, see, complete tasks, get along with others, understand, follow instructions,

remember things, and concentrate. (Tr. 140, 168). More specifically, plaintiff claims that she gets dizzy squatting or standing too long, bending bothers her "sometimes[,]" and she gets fatigued climbing stairs, walking and completing tasks. (Tr. 140; <u>see</u> Tr. 168). According to plaintiff, she can only walk twenty-five to fifty feet "or a little more[,]" which she later defined as "[t]hree blocks," or for two minutes, before she has to rest, she cannot concentrate, pay attention for "very long[,]" or remember spoken instructions, and she "hate[s] being told what to do." (Tr. 141, 169). Plaintiff reported that she does not handle stress well; she cries a lot and she does not handle changes in routine well. (<u>Id.</u>). Plaintiff fears dying and going completely blind, she feels alone and has no self-worth, she is tired all the time and in pain, and she reported that she used drugs in the past "out of frustration and to feel numb." (Tr. 142; <u>see</u> Tr. 164, 169-70). Plaintiff reported that as of January 1, 2008, her vision was getting worse as she was putting "more strain on [her] other eye" (Tr. 156), and as of July 3, 2008, plaintiff reported that her right eye was "starting to become blurry[,]" and as a result, she had become more depressed. (Tr. 176).

Plaintiff's work history reflects a series of jobs at Kmart, job placement services, Connecticut Performing Arts Partners, a cleaning company, a restaurant, and grocery stores in 1995, 1997, 1998, 1999, 2000 and 2004, in which she earned only "a few hundred dollars" during the course of each employment. (Tr. 42, 106-09; <u>see also</u> Tr. 144-50). Plaintiff reported to SSA that she stopped working on June 30, 2005, although she only worked one day in 2005. (Tr. 120). Plaintiff described her past work as "sales[,]" and she reported that she walked for five hours, stood for eight hours, stooped for three hours, reached for six hours, kneeled and crouched for one hour, and handled objects for two hours when employed in her sales positions. (Tr. 121). According to plaintiff, she had to lift and carry

different kinds of boxes with clothing, the heaviest boxes weighing twenty pounds, although plaintiff also reported that the weight she most frequently lifted was twenty-five pounds. (Id.). Plaintiff also described her past work as that of a "[d]epartment [c]lerk," "[c]lothes [s]orter," "[b]usser," mail sorter, and "[c]ashier." (Tr.144-51). At her hearing, plaintiff testified that she could only perform her past jobs for short periods of time because she "[cannot] be around a lot of people." (Tr. 42).[8]

Plaintiff reported to SSA that she has received regular treatment from the Charter Oak Clinic for asthma and depression from 1979 to May 2007. (Tr. 122; see also Tr. 157, 177). Additionally, she was hospitalized in November 2007[9] at Hartford Hospital. (Tr. 123; see Tr. 157, 177).

In a Vocational Analysis completed by Annette Pulcinella of Connecticut Department of Disability Services ["CT DDS"], Pulcinella concluded, considering plaintiff's age, education, past work history and the medical evidence, plaintiff could perform "Other Unskilled Work" with restrictions, and thus plaintiff was not disabled. (Tr. 173-74). According to Pulcinella, plaintiff could perform work as a security guard, housekeeper/cleaner, or office helper. (Tr. 174).

Plaintiff's medical records[10] begin on July 7, 2003 from Charter Oak Health Center ["Charter Oak"]; plaintiff's history of anemia was noted, as was her asthma. (Tr. 359; see Tr. 358-60). One year later, on July 7, 2004, plaintiff was treated at Charter Oak for

---

[8]At her hearing, plaintiff was "rocking," which she has done since she was a "little girl"; she attributes it to her nerves from being around a lot of people. (Tr. 44).

[9]Plaintiff also reported that the hospitalization was in March 2008. (Tr. 157).

[10]The earliest dated medical record in plaintiff's records is a report of a X-ray of plaintiff's skull taken on April 26, 1986; the conclusion was a "[n]ormal skull." (Tr. 316).

"nocturnal coughing[,]" vomiting, and irregular menses.  (Tr. 353, 355; see Tr. 353-57).

Adrienne J. Burns, PA-C diagnosed plaintiff with chronic obstructive pulmonary disease and prescribed Combivent.  (Tr. 354).  Plaintiff was anemic and she revealed a history of substance abuse and smoking. (Id.).  Additionally, plaintiff reported feeling depressed, tired and stressed.  (Tr. 355, 357).

On April 24, 2006, plaintiff underwent a Adult Clinical Assessment at Hartford Behavioral Health ["HBH"], during which plaintiff reported concerns over losing her housing and she recounted an incident in which she hit her landlord in the head with a wooden bat because she was angry.  (Tr. 196, 381; see Tr. 196-204, 381-89).  Plaintiff also reported a history of physical and substance abuse, and she reported she was clean for the past two years for the first time since she was a teenager, until the day before this assessment when she relapsed briefly.  (Tr. 198-200, 383-86).  Sue Nienietz, a clinician at HBH, described plaintiff as presenting with symptoms of flashbacks, anxiety, excessive worry, depressed mood, lability, initial insomnia, feelings of hopelessness, fleeting suicidal ideation, irritability and hyper vigilance.  (Tr. 196, 381; see also Tr. 202, 387).  Plaintiff also reported that she experienced homicidal ideation when she was angry at her boyfriend.  (Tr. 202, 387).  After the completion of the Assessment, Nienietz noted that plaintiff "appear[ed] to meet criteria" for post traumatic stress disorder ["PTSD"], Major Depression, single episode, and cocaine, cannabis, and alcohol dependence; plaintiff expressed an interest in working on her relationships and her temper.  (Tr. 203, 388).  Her Global Assessment Functioning [" GAF"] score upon intake was 44.  (Id.).[11]

[11]A GAF score of 41-50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders, 4th ed., at 32 ["DSM-IV"](emphasis omitted).

Plaintiff was seen at HBH on May 18, 2006, at which time plaintiff complained of feeling depressed for the past year, and while she was not experiencing suicide intent or plan, she experienced both over the past year along with seeing shadows and hearing voices. (Tr. 194-95, 379-80). Additionally, while she was "[c]lean from drugs" for the past two years, she had occasional flashbacks and nightmares of violence. (Tr. 194, 379; see Tr. 195, 380). Plaintiff was last seen at HBH on June 16, 2006, and she was formally discharged from their program on August 10, 2006 after "[s]uccessfully" completing therapy. (Tr. 191-92, 376-77). Her GAF score upon discharge was a 51.[12] (Tr. 191, 376).

On June 22, 2006, plaintiff was seen by Beth Villodas, APRN, after stopping her medications for one week. (Tr. 206, 391). Plaintiff was suffering mood and sleep disturbance, and she was put back on Lexapro. (Id.). A month later, on July 20, 2006, plaintiff returned to Villodas, who assessed plaintiff as having limited insight, superficial attitude, and sleep and anxiety problems; Villodas increased plaintiff's Lexapro and Mirtazapene. (Tr. 205, 390).

Plaintiff was seen on August 17, 2006 by Tina Robbins, PA-C, at Charter Oak for a refill of her asthma medications. (Tr. 349). At this appointment, plaintiff was also prescribed Wellbutrin SR for smoking cessation. (Id.).[13]

Almost one year later, on July 31, 2007, plaintiff underwent an adult physical exam with Robbins during which she complained of stress, depression, general anxiety and panic disorder, and insomnia. (Tr. 347-48). Plaintiff appeared "nervous[,]" and she was treated

---

[12]A GAF score of 51-60 is indicative of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV, at 32.

[13]Plaintiff was seen four months earlier for complaints relating to her right shoulder. (Tr. 350).

with Clonzepam for her general anxiety and panic disorders, and Ambien for her insomnia; she was given smoking cessation medication. (Tr. 348).

On August 13, 2007, plaintiff was treated at the Emergency Department of Hartford Hospital for pain resulting from a fall and from a bite wound her boyfriend inflicted on her back. (Tr. 248-49, 392).[14] Plaintiff was treated with pain medication and discharged. (Id.). Plaintiff was treated at the Emergency Department of Hartford Hospital four days later after complaining of continued right side pain. (Tr. 250-51, 396).[15]

On November 16, 2007, plaintiff presented to the Emergency Department again after taking crack/cocaine three days prior and then experiencing blurred vision and slurred speech. (Tr. 224-26, 261-63; see Tr. 219-20, 222-23, 253-54, 264, 399-400, 404-05). Plaintiff's history of asthma, depression, hypertension, and anemia were noted. (Id.). Plaintiff was admitted with monocular left eye blindness, and her treatment was overseen by Dr. Joao Gomes. (Tr. 222; see Tr. 273). In hospital records dated November 18, 2007, "extensive" blood loss was noted (Tr. 213, 260, 397), and plaintiff was evaluated for anemia and referred for a ob/gyn consult for evaluation of a "heavy/irregular period." (Tr. 214, 259). Plaintiff received a transfusion to increase her hemoglobin level. (Tr. 272).

The next day, plaintiff was seen by a neurologist at Hartford Hospital, who noted that plaintiff has had metromenorrhagia, or dysfunctional uterine bleeding, since June 2007, and that she was currently being followed by neurology for vision changes in her left eye. (Tr. 215, 258; see also Tr. 216,220-21, 252-53, 257). While she was hospitalized, plaintiff was seen at Hartford Hospital's dental clinic for pain on the lower left quadrant of her mouth;

---

[14]Plaintiff underwent blood work on August 1, 2007. (Tr. 209, 406).

[15]On August 17, 2006, plaintiff underwent a thin prep cervical screen which yielded negative results. (Tr. 311-12, 407).

plaintiff was advised to receive regular dental care. (Tr. 217, 256). Additionally, plaintiff was seen for the presence of greater nasopharyngeal tissue on the right side than the left, seasonal allergies, and allergic rhinitis. (Tr. 218, 255). On November 21, 2007, photographs were taken of plaintiff's eye by Retina Consultants, P.C. (Tr. 211). Plaintiff was discharged on November 26, 2007 with the following diagnoses: left optic neuropathy, severe anemia, thrombocytosis, fibromas, and naspharyngeal adenoma. (Tr. 272, 404). In plaintiff's discharge summary, it was noted that throughout the course of her treatment, plaintiff became "very agitated," and "she threatened" to sign herself out "multiple times for no apparent reason." (Id.).

Plaintiff returned to Hartford Hospital's Emergency Department on November 29, 2007, at which time she was diagnosed with fibroids and dysfunctional uterine bleeding. (Tr. 227; see Tr. 230-34). The next day, plaintiff underwent a pre-operative consultation with cardiology, and received a medical clearance, prior to undergoing fibroid surgery. (Tr. 235-37). On December 3, 2007, plaintiff underwent an echo-cardiogram which revealed normal LV systolic function. (Tr. 265, 398). The next day, plaintiff underwent a vaginal myomectomy, diagnostic hysteroscopy, "D and C," and endometrial ablation with NovaSure. (Tr. 269-71, 401-03). Plaintiff was discharged that day with Percocet and Motrin. (Tr. 228-29, 238, 266-68, 393-95). Plaintiff's discharge diagnoses were status post diagnostic hysteroscopy, dilation and curettage, vaginal myomectomy, and NovaSure ablation. (Tr. 266, 393).

Dr. Cary R. Freston completed a consultative examination of plaintiff for CT DDS on January 22, 2008. (See Tr. 274-78). Plaintiff presented with a "likely ethanol odor on [her] breath" and she acknowledged consuming alcohol the night before. (Tr. 274). Dr. Freston

noted that plaintiff frequently deferred questions to her boyfriend who attended the examination in its entirety, although plaintiff appeared "quite capable" of answering on her own.  (Tr. 276).  Although plaintiff reported that she has a heart murmur, Dr. Freston noted no murmur was identified upon examination.  (Tr. 275-76).  Plaintiff exhibited unlimited range of motion in her upper and lower extremities and her station and gait were normal.  (Tr. 277).  According to Dr. Freston's assessment, plaintiff exhibited blindness in her left eye, asthma, which he characterized as "intermittent," polysubstance abuse, possible cardiac murmur, "although [it was] not identified at [the] appointment," and intermittent dizziness, possibly anemia-related, "as patient is in recovery phase from anemic event."  (Id.).

Three days later, on January 25, 2008, Dr. Barbara Coughlin completed a Case Analysis of plaintiff for SSA, in which she noted that while plaintiff stated that she could not perform heavy physical activity, could not carry anything weighing more than five pounds, and had difficulty with stairs, there were no noted physical difficulties.  (Tr. 279).  Additionally, after noting plaintiff's records from July and November 2007 and January 2008, Dr. Coughlin concluded that plaintiff had well controlled asthma, unilateral vision impairment, and no evidence of significant cardiac pathology or early onset diabetes from her hypertension.  (Id.).

Plaintiff underwent a consultative examination by Dr. Jesus Lago for CT DDS on February 15, 2008 (Tr. 281-82), during which exam plaintiff complained that she was "feeling very depressed at this point[,]" as her sister passed away two years ago and plaintiff recently broke up with her boyfriend. (Tr. 281).  Plaintiff also reported that, with the exception of a short relapse, she had been sober for two years without any "substance abuse care."  (Id.).  Dr. Lago noted that plaintiff's mood was "depressed[,]" her affect was constricted, her insight

and judgment were fair, her cognition was intact, and her impulse control was good. (Tr. 282). Dr. Lago's Axis I impression was: depression, not otherwise specified, rule out major depression, mild; rule out dysthymia; and crack abuse in partial remission. (Id.). Dr. Lago opined that plaintiff would benefit from psychiatric care and treatment, as plaintiff "appear[ed] to be depressed." (Id.).

Four days later, Robert DeCarli, PsyD, completed a Psychiatric Review Technique of plaintiff for SSA (Tr. 283-96), in which he noted the presence of § 12.04 Affective Disorders, characterized as depressive disorder, NOS, and § 12.09 Substance Addiction Disorders, characterized by a history of cocaine abuse in remission; he concluded that plaintiff's impairments were not severe. (Tr. 283, 286, 291). According to Dr. DeCarli, plaintiff was mildly restricted in her activities of daily living, had mild difficulties maintaining social functioning and concentration, persistence or pace, and experienced no episodes of decompensation. (Tr. 293). Dr. DeCarli noted that while plaintiff reported physical problems and depression, she worked until 2005[16] and had independent activities of daily living, intact cognition, and related well, and her depression was characterized as "mild," so that "she currently show[ed] a non severe mental impairment." (Tr. 295)(emphasis omitted).

On March 14, 2008, Dr. David Waitzman of the Neuroopthalmology Clinic at the UConn Health Center saw plaintiff for a consultation regarding her acute visual loss in her left eye. (Tr. 301-04, 365-68). Regarding plaintiff's medical history, Dr. Waitzman noted that plaintiff had a history of hypertension, a "longstanding history of asthma[,]" a heart murmur, she was "severely depressed and ha[d] severe anxiety[,]" and she "had a longstanding history of anemia, probably secondary to her recurrent menorrhagia." (Tr. 302, 365).

---

[16]However, as the ALJ noted, plaintiff had no past relevant work (Tr. 36), and as referenced above, plaintiff worked only one day in 2005. (Tr. 120).

Plaintiff's memory was fair, and Dr. Waitzman noted that plaintiff's visual acuity was 20/25 in the right eye, and she had "some vision remaining in the left eye." (Tr. 303, 366). Dr. Waitzman reviewed plaintiff's CT scan which showed a "small subarachnoid hemorrhage in the interpeduncular fossa." (Tr. 303, 367). Dr. Waitzman opined that plaintiff experienced an episode of ischemic optic neuropathy involving the left optic nerve that occurred as a result of significant and severe anemia, and he "would have to presume significant hypotension." (Id.). Dr. Waitzman acknowledged that plaintiff had "significant cocaine on board, as well as a rather elevated sedimentation rate," but he thought that there was "not . . . clear evidence of vasculitis on her fluorescein angiogram" and the sedimentation rate could easily be explained by the "degree of anemia she presented with." (Tr. 304, 367). Dr. Waitzman gave plaintiff Systane to deal with her "severe dry eyes." (Id.).

On August 14, 2008, plaintiff underwent a thyroid ultrasound after complaining of pain on the left side of her neck for the past month. (Tr. 310). The ultrasound revealed a "subcutaneous ovoid solid nodule . . . in the left lower neck supraclavicular region, corresponding to the palpable abnormality. This [was] possibly an enlarged and abnormal lymph node" which would require "[c]lose clinical correlation." (Id.). "Also, further imagining with cross-sectional modalities such as a CT scan [was] recommended to assess for additional lesions." (Id.).

On August 19, 2008, Dr. Stephen F. Heller completed a Case Analysis of plaintiff for SSA, in which he noted the same entries included in Dr. Coughlin's January 2008 Case Analysis; Dr. Heller's only addition was "NSI." (Tr. 305).[17] On August 25, 2008, Dr. Virginia H. Rittner noted in a Case Analysis of plaintiff for SSA that plaintiff was in a "queue for

---

[17]Plaintiff had a mammogram three days later. (Tr. 308; see also Tr. 309). Previously, plaintiff had mammograms on November 8, 2003 and June 24, 1997. (Tr. 313-15).

medical review . . . but worksheet suggests . . . this has been completed by prior consultant[,]" and no new medical examination was received. (Tr. 317).

Gregory Hanson, PhD completed a Mental Residual Functional Capacity Assessment of plaintiff for SSA on August 25, 2008 (Tr. 318-21), in which he found plaintiff moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, to complete a normal workday and workweek, to interact appropriately with the general public, and to set realistic goals or make plans independently of others. (Tr. 318-19). He found plaintiff not significantly limited in her ability to remember locations or work-like procedures, and to carry out short and simple instructions, to perform activities within a schedule and sustain an ordinary routine without supervision, to work in coordination with others and make simple work-related decisions, to ask simple questions, accept instructions or respond appropriately to criticism, get along with coworkers or peers, maintain socially appropriate behavior, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places. (Id.). After reviewing plaintiff's treatment records, including her records from Charter Oak, and after considering plaintiff's self-reported activities of daily living, Dr. Hanson concluded that plaintiff's allegations of depression were credible, "not requiring more than [primary care physician's prescribed medications] to date, although [her] credibility [was] reduced to partial by . . . , claimant inconsistency and avoidance related to current usage." (Tr. 320). Dr. Hanson further noted that plaintiff was able to recall short, simple one to two step directions, work locations, and basic procedures, but she had "difficulty with detailed material when [she was] upset about loss of vision, or during periods of increased substance abuse." (Tr. 321). Additionally, he noted that time sensitive tasks of greater

complexity were problematic for plaintiff during periods of substance abuse or when she was "most upset about health problems[,]" and plaintiff would perform better in non-public settings, although she could talk to others, ask questions, keep reasonable appearance, and present polite, respectful, casually dressed and groomed. (Id.).

Dr. Hanson also completed a Psychiatric Review Technique (Tr. 322-25), in which he noted that plaintiff exhibited § 12.04 Affective Disorders, characterized by disturbance of mood and depressive syndrome evidence by sleep disturbance, psychomotor agitation, decreased energy, or difficulty concentrating or thinking (Tr. 325), and § 12.09 Substance Addiction Disorders, characterized by behavioral or physical changes, most closely applicable to § 12.04 Affective Disorders. (Tr. 330). According to Dr. Hanson, plaintiff had mild restrictions of activities of daily living, moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration. (Tr. 332).

Plaintiff underwent a physical exam by Dr. Charlene Browne at Charter Oak on August 11, 2008. (Tr. 341-43). Dr. Browne assessed plaintiff as depressed due to her medical problems, which Dr. Browne recommended treating with Wellbutrin, and she noted that plaintiff had a skin lesion and left eye blindness. (Tr. 342). Plaintiff underwent blood work and an ECG that same day. (Tr. 22-23, 344-45, 408-09). Plaintiff's ECG was abnormal "possibly due to myocardial ischemia." (Tr. 345, 409-10)(emphasis omitted). On August 28, 2008, Dr. Browne completed an assessment of plaintiff (Tr. 337-40), in which she noted that she had seen plaintiff for one visit, on August 11, 2008, and on that basis, diagnosed plaintiff with depression and a history of substance abuse. (Tr. 337). Plaintiff's speech and mood were normal, her thought content was appropriate, and her judgment and insight were

normal. (Tr. 338). Dr. Browne noted that plaintiff had no problem caring for her own personal hygiene or for her physical needs, asking questions or requesting assistance, carrying single step or multi-step instructions, focusing to finish simple activities, changing from one simple task to another, performing basic work activities, or performing work on a sustained basis, but she had an "[o]bvious [p]roblem" using good judgment regarding safety and dangerous circumstances, using appropriate coping skills to meet ordinary demands of work, and handling frustration appropriately. (Tr. 338-39).[18]

---

[18]On September 3, 2008, plaintiff was seen by Dr. Waitzman for a follow-up exam in which he noted plaintiff's severe dry eyes. (Tr. 369; see Tr. 369-71).

The remaining records were submitted to the Decision Review Board but were not produced to the ALJ prior to the hearing or to the issuance of his decision. (See Tr. 13-26). Pursuant to the Social Security Regulations, "in claims reviewed by the [Decision Review] Board, the record is closed as of the date of the administrative law judge's decision . . . ." 20 C.F.R. § 405.430. Further, as defendant appropriately notes, plaintiff has not requested that this Court remand so that the ALJ may consider these records. A court may issue a remand order for the review of new evidence under 42 U.S.C. § 405(g), "only upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." While there are records from medical visits on July 24 and 27, 2009, the remaining records are dated shortly before the ALJ's hearing, or after that date. After requesting and receiving the ALJ's approval to submit a post-hearing brief, to which these records were attached, the ALJ issued his decision eleven business days after his hearing, prior to plaintiff's counsel's submission. (See Tr. 4-26).

Although the substance of these records are not considered in this Court's review, these records reflect the following entries. On July 24, 2009, plaintiff was seen at Charter Oak for a blood pressure check, her asthma, which was classified as "mild persistent[,]" blurry vision in her right eye, and depression. (Tr. 20-21). Plaintiff reported experiencing anxious, fearful thoughts, irritable mood, diminished interest or pleasure and sleep disturbance. (Tr. 20). Plaintiff's asthma medications were refilled, plaintiff was given a refill of Ambien and plaintiff expressed an interest in wanting psychotherapy. (Tr. 21). Additionally, plaintiff was started on Hydrochlorothiazide for her hypertension. (Id.). One week later, on July 27, 2009, plaintiff was seen at Charter Oak for a follow-up visit regarding her high blood pressure; "everything [was] much improved," and plaintiff was "able to sleep better with [A]mbien." (Tr. 18-19). At that appointment, Dr. Browne also noted that plaintiff's asthma and hypertension were "much improved." (Tr. 19). Plaintiff returned on October 1, 2009, for a blood pressure check. (Tr. 13). In her records of that date, it was noted that plaintiff was negative for cough, dyspnea and wheezing. (Id.). She was assessed as having unspecified essential hypertension that was "much improved[,]" and she was advised to follow her current plan. (Id.).

Additionally, plaintiff underwent gynecological exams at Charter Oak on September 24 and November 3, 2009. (Tr. 10-11, 14-17; see also Tr. 24-26).

Plaintiff and Kerry Skillen, an impartial vocational expert,[19] testified at a hearing before ALJ Dolan on October 20, 2009. (Tr. 38-54). Plaintiff testified that she last used street drugs two years ago, and she drinks socially, on occasion. (Tr. 43). Plaintiff suffered a history of "[h]itting . . . abuse," from her parents and her ex-boyfriend (Tr. 45), and she testified that she has problems being around people as that makes her "nervous," such that she has to leave the situation. (Tr. 47-48).

According to plaintiff, her vision in her right eye is blurry, and she cannot walk more than three blocks due to her "very bad asthma[,]" although she still smokes cigarettes "[o]nce in a while." (Tr. 49). Her asthma medication makes her feel "shaky and nervous[,]" and her breathing is "worse" when she is "closed up in a room" by herself and "with other people." (Tr. 50). Plaintiff testified that every good day "always end[s] up being bad," and plaintiff has four or five bad days a week. (Tr. 50-51).

ALJ Dolan posed the following hypothetical to Skillen:

> [A]ssume a person of the claimant's age, education and work history without any exertional limitations, but with the need to avoid concentrated exposure to fumes, dust and gasses, also unable to perform jobs that require good peripheral vision, limited to simple, routine tasks in a stable environment where the work processes and procedures are fairly constant, able to interact with the public, but only on a fleeting basis and with a need to avoid exposure to hazards, would such a person be able to perform jobs in the regional or national economy?

(Tr. 52). The vocational expert responded, "[y]es," and examples of such jobs would be warehouse workers, packers, and assemblers, although the number of those jobs would be reduced by fifty percent "across the exertional demands to account for no hazards, so therefore, around no moving machinery." (Tr. 52-53). The ALJ then stated that he would

---

[19]See note 2 supra.

not pose a hypothetical based on "Dr. [Browne's] opinion because if I find that [it is] well supported, it would preclude the performance of sustained work on a regular basis." (Tr. 53).

The day after the hearing, on October 21, 2009, Dr. Browne completed a Pulmonary Residual Functional Capacity Questionnaire (Tr. 411-14), relating to plaintiff, in which she diagnosed plaintiff with asthma - "mild-intermittent," evidenced by shortness of breath, wheezing, episodic acute asthma, and coughing. (Tr. 411). Dr. Browne noted that plaintiff experienced these symptoms only with acute exacerbation, and the precipatory factors for her asthma attacks, which are "seldom - rare," were upper respiratory infections and "cold air/change in weather." (Tr. 411-12). According to Dr. Browne, emotional factors contribute to the severity of plaintiff's symptoms, and her symptoms would "[r]arely" be severe enough to interfere with attention and concentration to perform even simple work tasks. (Tr. 412). Dr. Browne, however, noted that plaintiff was "[i]ncapable of even 'low stress' jobs," "due to [her history of] depression/cocaine abuse[,]" which Dr. Browne was "afraid" plaintiff would return to as a coping mechanism. (Id.). Dr. Browne opined that plaintiff has good days and bad days and she would be absent about two days per month as a result of her impairments. (Tr. 414). Physically, plaintiff can sit for forty-five minutes, or for more than two hours at a time, stand for twenty minutes or one hour, stand/walk for less than two hours in an eight hour work day, and sit for at least eight hours. (Tr. 413). Additionally, plaintiff can occasionally lift less than ten pounds, rarely lift ten pounds, and never lift twenty or fifty pounds, and plaintiff can rarely twist, stoop, crouch/squat, or climb ladders or stairs. (Id.).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels

of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20

C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a). If the claimant is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(e). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"]. The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. See 20 C.F.R. § 416.945(a)(defining "residual functional capacity"

as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Dolan found that plaintiff has not engaged in any substantial gainful activity since December 10, 2007, the date of her application.  (Tr. 32).  ALJ Dolan then concluded that plaintiff has polysubstance abuse, depression, anxiety, post traumatic stress disorder, and left eye blindness status post cocaine induced cerebrovascular accident.  (Id.; see 20 C.F.R. § 404.1520(c)). In the third step of the evaluation process, the ALJ concluded that plaintiff's impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 32-34).  In addition, at step four, ALJ Dolan found that after consideration of the entire record, plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she must avoid concentrated exposure to fumes, dusts, odors and gases; she is unable to perform jobs requiring peripheral vision; and she is limited to performing simple, routine tasks in a stable work environment with no more

than fleeting public contact. (Tr. 34-35). The ALJ also noted that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the above RFC assessment. (Id.). Plaintiff has no past relevant work, but the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform, and thus a finding of "not disabled" is appropriate under the Grid. (Tr. 36-37).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ "failed to recognize the proper diagnoses of [plaintiff's] physical illnesses and ailments[,]" including the proper diagnoses of plaintiff's mental or emotional illnesses; the ALJ failed to find certain illnesses and ailments severe, including her asthma, allergies, hypertension, anxiety, insomnia, and anemia; and the ALJ failed to evaluate all of her illnesses and ailments singly and in combination. (Dkt. #15, Brief at 15-23)(emphasis omitted). Additionally, according to plaintiff, the ALJ committed factual errors in his evaluation of the evidence (id. at 23-26); the treating physician rule requires a finding of disability (id. at 26-28); plaintiff has the "required clinical signs and symptoms" of Listing Sections 12.04 and 12.06 (id. at 28-30); and the ALJ failed to properly determine plaintiff's RFC (id. at 30-36).[20]

Defendant asserts that the ALJ's decision accounts for all of plaintiff's severe impairments (Dkt. #22, Brief at 13-19), and even if the ALJ should have found some of plaintiff's additional impairments or some combination of the same to be severe, his failure to do so at step two was harmless (id. at 20-22); the ALJ did not err in failing to use the

---

[20]The Court notes the reference to a different plaintiff in plaintiff's brief (see Dkt. #15, Brief at 27). While this Magistrate Judge is intimately familiar with the crushing Social Security caseload facing counsel and the Court alike, plaintiff's counsel is strongly urged to tailor his briefs to the specific plaintiff and the issues in his or her specific case.

DSM-IV listing names for plaintiff's mental illnesses (id. at 22-23); substantial evidence supports that plaintiff's mental impairments did not meet Listings 12.04 and 12.06 (id. at 23-25); substantial evidence supports the ALJ's RFC assessment (id. at 25-35); and plaintiff's allegations of factual errors are misplaced and unavailing (id. at 35-38).

A. PLAINTIFF'S IMPAIRMENTS

As stated above, in his decision, the ALJ concluded that plaintiff has the following severe impairments: polysubstance abuse, depression, anxiety, post traumatic stress disorder, and left eye blindness status post cocaine induced cerebrovascular accident." (Tr. 32). Plaintiff contends that in reaching this conclusion, the ALJ failed to evaluate and find severe plaintiff's "at least fifteen different diagnose[d] . . . illnesses and ailments."[21] (Dkt. #15, Brief at 15).

For a claimant to establish that she suffers from a severe impairment or combination of impairments, a claimant must show more than the mere existence of a condition or ailment. See Bowen v. Yuckert, 482 U.S. 137, 153 (1987)["Yuckert"]. At the second step of the sequential evaluation, a claimant bears the burden of showing that she has an "impairment or combination of impairments which significantly limits [the] the physical or mental ability to do basic work activit[y] . . . " see 20 C.F.R. § 404.1520(c), 20 C.F.R. § 416.920(c), and the impairment "must have lasted or must be expected to last for a continuous period of at least [twelve] months." 20 C.F.R. § 404.1509. The purpose of step two is to screen out de minimis claims. Dixon v. Shalala, 54 F.3d 1019, 1030 (2d. Cir. 1995),

---

[21]According to plaintiff, she has been diagnosed with the following: Major Depressive Disorder; Generalized Anxiety Disorder; Panic Disorder Without Agoraphobia; Post Traumatic Stress Disorder; Substance Abuse in Remission; Asthma; Menorrhagia; Uterine Fibroids Status Post Myomectomy; Chronic Anemia; Ophthalmic Artery Occlusion causing total blindness in the left eye and blurred vision in the right eye; Hypothyroidism; GERD; Hypertensive Cardiovascular Disease; Subarachnoid Hemorrhage; and persistent Headaches. (Dkt. #15, Brief at 15).

citing Yuckert, 482 U.S. at 158 (O'Connor, J., concurring, joined by Stevens, J.).

While there is evidence in record of plaintiff's alleged impairments, the ALJ did not err in concluding that the record lacks evidence to support a finding that plaintiff's substance abuse is in remission, menorrhagia, uterine fibroids status post myomectomy, chronic anemia, Ophthalmic artery occlusion causing total blindness in the left eye and blurred vision in the right eye, hypothyroidism, GERD, hypertensive cardiovascular disease, subarachnoid hemorrhage,[22] and persistent headaches "lasted or [are] expected to last for a continuous period of at least [twelve] months," 20 C.F.R. § 404.1509, and "significantly limit[ ][plaintiff's] physical or mental ability to do basic work activities . . . ." See 20 C.F.R. § 404.1520(c).

Plaintiff was treated for her menorrhagia and uterine fibroids with surgery on December 4, 2007, and there is no record of treatment for this after she was discharged from the hospital the same day as the surgery. (See Tr. 266-68; see also Tr. 301, 365). Additionally, while plaintiff was diagnosed with hypothyroidism and prescribed Levothroxine when she was admitted to Hartford Hospital in November 2007, she did not report that she was taking this prescription when she underwent a physical with Dr. Browne in August 2008. (Tr. 272, 341-42). Similarly, plaintiff's complaints of headaches and blurred vision in her right eye were intermittent (see, e.g., Tr. 48-49, 225, 272), and notably, plaintiff did not complain of blurred vision in her right eye to Dr. Waitzman whom she saw at the Neuroopthalmology Clinic, although she did report to Dr. Waitzman that her headaches had resolved. (Tr. 301-02, 366-67). Plaintiff also did not complain of problems with her vision

---

[22]While there is a reference to a "small subarachnoid hemorrhage" found on a CT scan, plaintiff received no follow-up treatment for this, and there is no further mention of it in her record. (Tr. 303,367).

in her right eye to Drs. Freston and Browne, and upon examination, Dr. Waitzman noted that plaintiff's visual acuity in the right eye was 20/25 and he only prescribed eye drops for her severe dry eyes. (Tr. 274-76, 301-04, 341-42, 365-68). Additionally, while there is brief mention in the record of epigastric pain for which plaintiff was prescribed Zantac, there is nothing in the record to suggest that this, even in combination with plaintiff's other impairments, would have an impact on her ability to perform work activities. (Tr. 355, 357, 362, 399; see also Tr. 124, 130, 158, 165, 178, 215, 217, 256, 275, 341, 374, 599)(mentioning, without discussion, GERD, Omeprozole or Nexium). Similarly, while plaintiff claimed in her application for benefits that her hypertension prevented her from working, there is no support in the record, from her treating doctors or otherwise, how hypertension impacts her basic work activities, much less, required treatment beyond a prescription for Hydrochlorothiazide.

The great majority of plaintiff's medical treatment records include references of and treatment for plaintiff's "severe" anemia and the resulting fatigue, and yet the ALJ does not include a consideration of these impairments, either singly or in combination, in his decision. It is perplexing that the ALJ acknowledges Dr. Waitzman's opinion that plaintiff's left eye blindness "occurred as a result of severe anemia and presumed hypotension[,]" yet he found as a "severe" impairment "left eye blindness status post cocaine induce cerebrovascular accident," and failed to address plaintiff's anemia in his decision. (Tr. 32).

Dr. Waitzman, a specialist in the field of neuroopthamology, opined that plaintiff's left eye blindness was caused by "an episode of ischemic optic neuropathy involving the left optic nerve. This occurred as a result of significant and severe anemia, and I would have to presume significant hypotension." (Tr. 303, 367). He continued that, "[w]ith the degree of

menorrhagia that she experienced, this can often lead to reduction of flow to the posterior ciliary arteries and cause secondary blindness. In my opinion, it is actually miraculously that the patient did not lose vision in her opposite eye as well." (Tr. 303-04, 367). Dr. Waitzman also noted that what plaintiff experienced is "actually, a rather well described phenomenon in the literature[,]" (Tr. 304, 367), yet without explaining why his finding of the cause of plaintiff's left eye blindness differed from the finding of a specialist in the field, the ALJ erroneously concluded that plaintiff has a severe impairment of "left eye blindness status post cocaine induced cerebrovascular accident." (Tr. 32).[23]

Moreover, in addition to the absence of consideration of plaintiff's anemia, the ALJ failed to consider plaintiff's insomnia and the severity of plaintiff's fatigue, and the affect, if any, of these extensively documented physical impairments (see, e.g., Tr. 196, 202, 347-48, 387), on plaintiff's ability to perform basic work activities. Additionally, plaintiff appropriately questions the ALJ's treatment of plaintiff's asthma at step two. The ALJ did not fully evaluate plaintiff's asthma, and in failing to do so, he did not address whether her asthma is a severe impairment, yet in the absence of a severity determination, he concluded that the "severity

---

[23]Additionally, when plaintiff initially appeared at the Emergency Department of Hartford Hospital on November 16, 2007, she reported that she had taken crack/cocaine three days prior and then began to experience blurred vision and slurred speech, (Tr. 224-26, 261-63; see Tr. 219--23, 253-54, 264, 404-05), in the hospital records dated two days later, "extensive" blood loss was noted (Tr. 213, 260, 397), and plaintiff was evaluated for anemia and referred for a ob/gyn consult for evaluation of a "heavy/irregular period." (Tr. 214, 259). Plaintiff received a transfusion to increase her hemoglobin level (see Tr. 272), and the next day, plaintiff was seen by a neurologist at Hartford Hospital who noted that plaintiff has had metromenorrhagia, or dysfunctional uterine bleeding, since June 2007, and that she was currently being followed by neurology for vision changes in her left eye. (Tr. 215, 258; see also Tr. 216,220-21, 252-53, 257). Plaintiff was discharged from the hospital on November 26, 2007 with, among other diagnoses, diagnoses for left optic neuropathy and severe anemia. (Tr. 272, 404).

Moreover, when Dr. Freston examined plaintiff on December 22, 2008, he noted that plaintiff presented with intermittent dizziness, which he characterized as "possibly anemia-related, as patient is in recovery phase from anemic event." (Tr. 277).

of [plaintiff's] asthma" does not satisfy the requirements of Listing 3.03.  (Tr. 32-33).[24]  The ALJ then accounted for some limitations imposed by plaintiff's asthma in his RFC determination at step three, by relying on the vocational expert's response to the hypothetical the ALJ posed at plaintiff's hearing.  (See Tr. 52-53).  Thus, the ALJ concluded that plaintiff "must avoid concentrated exposure to fumes, dust, odor and gases . . . ."  (Tr. 34).

Further, while the medical record supports the ALJ's references to plaintiff's asthma as "mild-intermittent" (Tr. 411; see Tr. 35 ("mild and intermittent")),[25] the ALJ did not consider plaintiff's asthma in combination with her other impairments, and particularly, in combination with plaintiff's depression.   Consideration of these conditions in combination is particularly important in this case when  plaintiff's treating physician, Dr. Browne, opined, in response to questions posed in a "Pulmonary Residual Functional Capacity Questionnaire" (Tr. 411-14), that plaintiff's performance of "even 'low stress' jobs" could cause an exacerbation of her asthma, and could trigger plaintiff's symptoms of depression and cause her to revert to her past substance abuse.  (Tr. 412).   Furthermore, while the ALJ concluded that plaintiff's depression, anxiety[26] and post traumatic stress disorder are severe

---

[24]It is beyond dispute that a claimant may have a severe impairment, but that impairment does not meet or equal the criteria of an impairment listing in the Regulations at 20 C.F.R. Part 404, Subpt. P, App. 1, as the latter determination is made at step three of the sequential analysis, and the severity determination is made at step two.  See 20 C.F.R. § 404.1520(c); 20 C.F.R. § 404.1520(d).

[25]While plaintiff claims a factual error by the ALJ in failing to mention Dr. Freston's finding of rhonchi (see Dkt. #15, Brief at 24), the error is harmless as Dr. Freston's complete findings are consistent with the ALJ's conclusion.  Dr. Freston found that "there is scant rhonchi that clears easily in the upper fields, but no wheeze or other abnormality is identified on forced expiratory maneuver."  (Tr. 276). Consistent with Dr. Browne's conclusion (Tr. 411), Dr. Freston concluded that plaintiff's asthma was "intermittent."  (Tr. 277).

[26]Plaintiff asserts that the ALJ failed to recognize the correct diagnoses of plaintiff's mental impairments, which she claims are Major Depressive Disorder, Generalized Anxiety Disorder, and

impairments, he failed to consider these impairments in combination as well. The Social Security Regulations require that when a claimant has multiple impairments, the Commissioner "will consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. §§ 404.1523, 416.923; see also 42 U.S.C. § 423(d)(2)(c), 1382(a)(3)(f)("the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.").   Once an ALJ finds "a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process." Id.; see Wright v. Barnhart., No. 3:05 CV 1487(SRU)(WIG), 2006 WL 4049579, at *15  (D. Conn. Dec. 14, 2006)(remand ordered after ALJ determined mental impairment was non-severe but then "set it aside without further discussion" and evaluated only claimant's physical impairments).   Contrary to defendant's assertion, the ALJ did not "summarize[ ] the medical record concerning [p]laintiff's treatment for all relevant impairments."  (See Dkt. #22, Brief at 19).   Rather, the ALJ limited his discussion at step two, as it related to plaintiff's non-mental limitations, to a few short paragraphs and there is no discussion of the combination of plaintiff's impairments.  (Tr. 32-34).  The ALJ's analysis

---

Panic Disorder Without Agoraphobia following the DSM-IV.  (Dkt. #15, Brief at 18-20).  Plaintiff posited this argument recently in Concepcion v. Astrue, No. 3:09 CV 1396(SRU)(WIG), 2010 WL 2723184, at *2-3 (D. Conn. July 8, 2010), which argument was rejected on grounds that there is no authority that depression cannot be a diagnosis, or that the ALJ is limited to psychiatric disorders set forth in the DSM-IV, and plaintiff's medical record, as is the case here as well, was replete with diagnoses consistent with the diagnostic terms used by the ALJ.  The doctors from Hartford Hospital, Robbins, Villodas, Dr. Lagos, and Dr. Browne all diagnosed plaintiff with "depression" (Tr. 194, 248, 282, 337, 341-42, 347, 393), and Drs. Waitzman and Freston characterized plaintiff as having a history of "anxiety."  (Tr. 275, 302).  As in Concepcion, the Magistrate Judge in this case finds no error in the ALJ's finding as severe impairments plaintiff's "depression" and "anxiety."

at step two was erroneous as a matter of law and a remand order is appropriate.

Furthermore, when assessing plaintiff's residual functional capacity at step three of the sequential analysis, the Social Security Regulations require the ALJ to consider "all of [plaintiff's] medically determinable impairments of which [the ALJ was] aware, including [plaintiff's] medically determinable impairments that are not 'severe.'" 20 C.F.R. § 416.945. Thus, it would be harmless error at step two for an ALJ to fail to find an impairment severe as long as the ALJ determines that at least one of the claimant's impairments are severe, and then continues with the remaining steps of the analysis. Maziarz v. Sec'y of Health & Human Svs., 837 F.2d 240, 244 (6th Cir. 1987); see also Swartz v. Barnhart, 188 Fed. Appx. 361, 368 (6th Cir. 2006)(citation omitted). As stated above, contrary to defendant's contention, the ALJ did not "summarize[ ] the medical record concerning [p]laintiff's treatment for all relevant impairments," which, if he had, defendant would be correct in stating that such a summary would have "indicate[d] that he adequately considered all relevant impairments and combinations of the same." (Dkt. #22, Brief at 19). In the absence of any reference to plaintiff's severe anemia as an impairment, or an analysis of the severity of plaintiff's anemia and asthma in combination with her other impairments, it would not be possible for the Court to make the assumption that plaintiff's anemia, and resulting fatigue, or that plaintiff's asthma, in combination with plaintiff's mental impairments, was considered in the ALJ's RFC determination. Even if plaintiff's above-referenced illnesses and impairments are found to be "not severe," the ALJ is not alleviated from his duty to consider all of plaintiff's impairments in his RFC assessment, as the Social Security Regulations provide that "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe." 20 C.F.R. § 404.1545(a)(2);

see Social Security Ruling ["SSR"] 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). Thus, on remand, the ALJ shall consider the severity of plaintiff's impairments, separately and in combination, and shall consider plaintiff's severe and non-severe impairments in his RFC assessment before making his final RFC determination.

### B. ALJ'S ASSESSMENT OF PLAINTIFF'S MENTAL IMPAIRMENTS AND RFC

Plaintiff contends that the ALJ erred in concluding that plaintiff's mental impairments did not meet Listings § 12.04 and § 12.06. (Dkt. #15, Brief at 28-30). For plaintiff to be found disabled under Listing § 12.04 or § 12.06, plaintiff must meet the Listing's characteristics identified in Paragraph A and Paragraph B, or Paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(A). The Paragraph B criteria for Listings § 12.04 and § 12.06 require that plaintiff show at least two of the following: (1) marked restrictions in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, of pace; or (4) repeated episodes of decompensation, each of extended duration. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04B, 12.06B. The ALJ concluded that plaintiff does not meet these Listings as she had only mild restriction in her activities of daily living; she has moderate difficulties in her social functioning; she has moderate difficulties with her concentration, persistence, or pace; and she has experienced one to two episodes of decompensation, each of extended duration. (Tr. 33). While plaintiff contends that she has marked difficulties in both maintaining social functioning and in maintaining concentration, persistence or pace (Dkt. #15, Brief at 28-30), the ALJ's findings on this issue are supported by substantial evidence.

Dr. Hanson found that plaintiff has moderate difficulties maintaining social functioning (Tr. 332), while Dr. DeCarli opined that plaintiff's difficulties in social functioning are mild (Tr.

293).    Additionally, while Dr. Lago found plaintiff's mood "'depressed'" and her affect "constricted[,]" and he noted that on Axis I, plaintiff has depression, not otherwise specified; rule out major depression, mild; and rule out dysthymia, he also noted that plaintiff was "polite and respectful" and "appropriately engageable." (Tr. 282).  Dr. Waitzman noted that during his neuroopthamological examination of plaintiff, plaintiff was "clearly quite anxious and [was] intermittently going in and out of the room during the examination."  (Tr. 302, 366).    The foregoing supports a finding of "moderate difficulties in maintaining social functioning."

Dr. Hanson concluded that plaintiff has moderate difficulties maintaining concentration, persistence or pace, and he found one to two episodes of decompensation, each of extended duration. (Tr. 332).    Dr. DeCarli opined that plaintiff has only mild difficulties maintaining concentration, persistence or pace, and experiences no episodes of decompensation (Tr. 293), and similarly, Dr. Browne opined that plaintiff has no problem carrying out single-step instructions, focusing long enough to finish assigned simple activities or tasks, changing from one simple task to another, and performing work activity on a sustained basis.  (Tr. 339).    Thus, the ALJ's conclusion that plaintiff has moderate difficulties maintaining concentration, persistence or pace, is supported by the medical record.

While the ALJ acknowledged that the "limitations in the 'paragraph B' criteria are not a residual functional capacity assessment" as the "mental residual functional capacity assessment used at steps [four] and [five] of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B[,]" the ALJ failed to make that "more detailed assessment" before reaching his conclusion as to plaintiff's RFC.  (Tr. 33).  There is no reference in the ALJ's RFC

determination that he accounted for plaintiff's "one to two episodes of decompensation, each of extended duration." (See Tr. 332).   The ALJ did not reference the frequency or intensity of the episodes, nor did he consider the impact these episodes would have on plaintiff's ability to perform basic work activities.   Further, these episodes were not referenced in the ALJ's hypothetical posed to the vocational expert, upon which the ALJ relied in reaching his conclusion as to plaintiff's RFC.   Accordingly, on remand, the ALJ will include in his RFC finding all of the functional limitations caused by plaintiff's severe and non-severe impairments.[27]

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order Reversing the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #15) is **granted in part such that this matter is remanded to the ALJ for a rehearing and an assessment of the severity of plaintiff's impairments and RFC findings that include all of plaintiff's limitations**, and defendant's Motion for Order Affirming the Decision of the Commissioner is (Dkt. #22) is **granted in part and denied in part**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

---

[27]In light of the conclusion reached above, the Court need not address the other issues raised by plaintiff.

Dated this 11th day of April, 2011 at New Haven, Connecticut.


　　/s/ Joan G. Margolis, USMJ　　
Joan Glazer Margolis
United States Magistrate Judge